UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| STACY ALLEN KISER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:12-CV-519 |
| | ) | (PHILLIPS/GUYTON) |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the

Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation

regarding disposition by the District Court of Plaintiff's Motion for Judgment on the Pleadings

and Memorandum in Support [Docs. 13 and 14] and Defendant's Motion for Summary Judgment

and Memorandum in Support [Docs. 15 and 16]. The Plaintiff filed a response [Doc. 17] to the

Commissioner's motion. Stacy Allen Kiser ("Plaintiff") seeks judicial review of the decision by

Administrative Law Judge ("ALJ"), and the final decision of the Defendant Carolyn W. Colvin,

Commissioner of Social Security ("the Commissioner").

On February 20, 2009, the Plaintiff filed an application for a period of disability,

disability insurance benefits, and supplemental security income, claiming a period of disability

which began on July 11, 2008. [Tr. 151-62]. After his application was initially denied and denied

again upon reconsideration, the Plaintiff requested a hearing. [Tr. 71]. Hearings were held on

September 7, 2010, and January 18, 2011, before an ALJ to review the Plaintiff's claim. [Tr. 33,

1

44]. On February 7, 2011, the ALJ found that the Plaintiff was not disabled. The Appeals Council denied the Plaintiff's request for review; thus, the decision of the ALJ became the final decision of the Commissioner.

The Plaintiff now seeks judicial review of the Commissioner's decision.

## I. ALJ FINDINGS

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since July 11, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: borderline intellectual functioning, residuals from fracture to right lower extremity and right upper extremity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that the claimant can do no more than simple, repetitive, non-detailed tasks; that the claimant have no more than casual and non-frequent contact with co-workers and the public; and that the supervision of the claimant be direct and non-confrontational.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 10, 1969, and was 38 years, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

2

8.  The claimant has limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 11, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[Tr. 19-27].


## II.    DISABILITY ELIGIBILITY

To qualify for SSI benefits, a plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. An individual is eligible for SSI if he has financial need and he is aged, blind, or under a disability. See 42 U.S.C. § 1382(a).

"Disability" is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). An individual shall be determined to be under a disability only if his physical and/or mental impairments are of such severity that he is not only unable to do his previous work, but also cannot, considering his age, education,

3

and work experience, engage in any other kind of substantial gainful work which exists in the

national economy, regardless of whether such work exists in the immediate area in which he

lives, whether a specific job vacancy exists for him, or whether he would be hired if he applied

for work. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. §

404.1520).

A claimant bears the burden of proof at the first four steps. Id. The burden of proof

shifts to the Commissioner at step five. Id. At step five, the Commissioner must prove that there

is work available in the national economy that the claimant could perform. Her v. Comm'r of

Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) (citing Bowen v. Yuckert, 482 U.S. 137, 146

(1987)).

## III. STANDARD OF REVIEW

4

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 405 (6th Cir. 2009) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). If the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed. Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quotation omitted); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)).

It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. Crisp v. Sec'y of Health & Human Servs., 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001) (quoting Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." Walters, 127 F.3d at 528.

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure

5

mandated by the regulations and rulings promulgated by the Commissioner.  See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004).  The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.

An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." Wilson, 378 F.3d at 546-47.  Thus, an ALJ's procedural error is harmless if his ultimate decision was supported by substantial evidence *and* the error did not deprive the claimant of an important benefit or safeguard.  See id. at 547.

On review, Plaintiff bears the burden of proving her entitlement to benefits.  Boyes v. Sec'y of Health & Human Servs., 46 F.3d 510, 512 (6th Cir. 1994) (citing Halsey v. Richardson, 441 F.2d 1230 (6th Cir. 1971)).

## IV.    EVIDENCE

The Plaintiff was thirty-eight years old on his alleged onset date and was forty-one years old at the time of the ALJ's decision. [Tr. 47].  He received a limited education and has previously worked as a heating and air conditioning helper, a construction worker, and upholstery furniture worker. [Tr. 196-203, 287].


*A.    Medical Evidence*

In July 2006, the Plaintiff suffered a work-injury that left him with a fractured femur and elbow.  [Tr. 518].  Several physicians were involved in his treatment:  M.D. Richard Beaver, an

6

orthopedic specialist, performed surgery and directed the Plaintiff's overall recovery; M.D. Hal Moncier, a primary care provider, managed the Plaintiff's Deep Vein Thrombosis that resulted from the injury; M.D. Ronald Bryan performed nerve conduction tests; MSPT Bradley Moore provided physical therapy; and Radiologist J. Breese Johnson X-rayed the Plaintiff's knee, hip, shoulder, and lower spine after he complained of regressive symptoms in 2009. Additionally, three consultative examiners assisted with Plaintiff's assessment: Ph.D. Philip Axtell completed IQ testing and a psychological evaluation, M.D. Joe Allison performed a Physical Residual Functional Capacity Assessment, and M.D. Eva Misra provided a physical examination.

After fracturing his elbow and femur on July 31, 2006, the Plaintiff was taken to the emergency room where Dr. Beaver performed invasive surgery. [Tr. 529]. During the surgery, Dr. Beaver inserted into the Plaintiff's right femur a metal rod fixed by several screws and extending from his hip to the top of his knee. [Tr. 530].

The Plaintiff made a substantial recovery in the ensuing months. By May 31, 2007, the Plaintiff reported "overall improvement," and was able to tolerate full work days with no restrictions. [Tr. 524]. Dr. Beaver gave Plaintiff a 22% whole body impairment rating, 19% of which he accredited to the fractured femur. [Tr. 525]. The Plaintiff reported that full-time work caused him pain "every now and again," but otherwise he had no complaints. [Tr. 524].

Two years later in July 2009, the Plaintiff was reexamined by Dr. Beaver after he experienced increased pain in both his hip and right arm. Initially, Dr. Beaver suspected that the arm pain was associated with cubital tunnel syndrome, but subsequent nerve induction tests by Dr. Bryan presented "no abnormalities." [Tr. 527]. Ultimately, Dr. Beaver found that his elbow, wrist, and finger "flexion and extension" were intact, as were his abduction and adduction. [Tr.

526]. However, his hip region was "tender to palpation," and he had "decreased sensation over his median and ulnar" nerves. [Tr. 526].

Dr. Beaver referred the Plaintiff to Dr. Moncier to help manage the Deep Vein Thrombosis that resulted from his initial injury. Dr. Moncier essentially performed the role of the Plaintiff's primary care physician.[1] From August 2006 to May 2007, Dr. Moncier routinely prescribed anti-coagulate medication and performed Pro-thrombin time tests. [Tr. 558]. Plaintiff's visits with Dr. Moncier ceased in May of 2007; but he was reexamined on March 24, 2010, when, proximate to his disability claims, he needed an evaluation of his right hip, knee, and elbow. [Tr. 535]. Plaintiff reported that he had not worked since February of 2008 and that his shoulder pain began roughly in August of 2008. [Tr. 535]. Dr. Moncier ordered X-ray exams of the Plaintiff's lower spine, shoulder, hip, and knee. [Tr. 536].

Radiologist Breese Johnson analyzed the X-rays and found that Plaintiff's shoulder alignment, bones, and soft tissues were normal; his knee was unremarkable aside from the metal rod and screw; his femur bone had good alignment and no significant degenerative changes at the hip; and his lower back had good alignment and no significant degenerative changes. [Tr. 536-40].

Concurrent with his treatment from Dr. Beaver and Dr. Moncier, the Plaintiff also underwent 12 sessions of physical therapy from Dr. Bradley Moore between October 31, 2006, and December 8, 2006. [Tr. 486]. Moore opined that he did "well with the treatment," but continues to have right "leg weakness and ambulates with a limp." [Tr. 486].

---

[1] Plaintiff was referred to Dr. Moncier to manage Patient's Deep Vein Thrombosis stemming from his injuries sustained in 2006. Dr. Moncier saw patient over sixteen times between August 2006 and March 2007; treated Patient's flu in April and May of 2007; and evaluated him in support of his request for disability benefits and supplemental income. [Tr. 535-40].

8

In May 2009, the Plaintiff was examined by Eva Misra, M.D. [Tr. 499-502]. Dr. Misra stated that the Plaintiff was well developed; that he utilized no assistive devices and could get up from a chair without difficulty; and that his extremities had a full range of motion. [Tr. 501]. Dr. Misra noted that the Plaintiff had some pain on straight leg raises, but she ultimately found the patient to have "no impairment related physical limitations." [Tr. 501].

In July 2009, the Plaintiff underwent a Physical Residual Functional Capacity Assessment by Dr. Joe Allison. [Tr. 503-11]. In the evaluation, Dr. Allison found that the Plaintiff was (1) capable of lifting 50 pounds occasionally and 25 pounds frequently; (2) able to stand or sit for 6 hours of an 8 hour work day; and (3) unlimited in his ability to operate hand or foot controls. [Tr. 504]. He found that the Plaintiff was also capable of climbing, balancing, stooping, kneeling, crouching, and crawling in frequent amounts. [Tr. 505]. Dr. Allison noted that Plaintiff's self-assessment was only "partially credible" because Dr. Misra found the Plaintiff to have full range of motion "in all joints," normal grip, and gait station. [Tr. 510]. Dr. Allison found that "some pain would be reasonable," but the Plaintiff only has "minimal physical limitations." [Tr. 510].

In October 2010, Dr. Axtell performed a psychological evaluation and IQ testing. [Tr. 578-89]. Dr. Axtell found that the Plaintiff showed adequate use of "basic vocabulary and math skills," but had "a poor capacity for abstract thinking and understanding." [Tr. 580]. Plaintiff's "overall intellectual abilities" were measured in the "Extremely Low range, with an FSIQ standard score of 61 at the 0.5th percentile." [Tr. 581]. He noted an apparent deficit in Plaintiff's "working memory and processing speed." [Tr. 582]. Ultimately, however, Dr. Axtell concluded that the Plaintiff fell "in the borderline range of intellectual functioning, where the Plaintiff showed evidence of moderate impairments in short and long term memory, and only mild

9

impairments in social relating and ability to adapt to change. [Tr. 585]. Dr. Axtell also noted that Plaintiff's academic achievement fell into the "low to lower extreme range," and that his reading and basic math abilities were in the low range. [Tr. 586]. His weakest area, spelling, was measured in the low extreme range. [Tr. 586]. Dr. Axtell opined that although his intellectual abilities were measured "in the range typically associated with mental retardation," he could not diagnose him with mental retardation where "there is no evidence of mental retardation or significant intellectual deficits prior to his 18th birthday." [Tr. 586]. Moreover, he opined that although his academic achievement also fell into the "extreme to low range in all measured areas," there was "no evidence of a learning disorder." [Tr. 586]. In fact, he found that his academic skills exceeded his "intellectual ability." [Tr. 586].

### B.    Other Evidence

Independent vocational expert, Ernest Brewer, testified at the hearing. He testified that the Plaintiff had past experience as a heating and air conditioning helper, which is heavy and semi-skilled; a construction worker, which is heavy and unskilled; and an upholstery furniture worker which is medium and semiskilled. [Tr. 38]. The ALJ posed a hypothetical question incorporating the Plaintiff's residual functional capacity and asked whether such a person could perform the Plaintiff's past relevant work. [Tr. 38]. Mr. Brewer testified that such a person would not be able to perform the Plaintiff's past relevant work. [Tr. 59]. However, Mr. Brewer stated that there were other jobs that could be performed, such as janitorial, dishwashing, or hand packaging type jobs, which are at the medium level. [Tr. 39]. In addition, he testified that there were a number of positions available, both regionally and national. [Tr. 39]. He also testified

that if the Plaintiff could not work 8-hour days, 5 days a week, then there would not be positions available to him. [Tr. 40].

## V. POSITIONS OF THE PARTIES

The Plaintiff presents three allegations of error. First, he argues that ALJ erred in disqualifying him as mentally retarded under Listing 12.05C. [Doc. 14 at 15]. Second, the Plaintiff asserts that the ALJ failed to properly apply 20 C.F.R. 404.152(c) when finding that the Plaintiff could perform full range medium level work. [Id. at 7-9]. Finally, he contends that the ALJ's decision to discount the Plaintiff's credibility was not supported by substantial evidence. [Id. at 23].

The Commissioner responds that substantial evidence supports the ALJ's finding that the Plaintiff failed to show his impairment met the requirements of Listing 12.05C. [Doc. 16 at 12]. Second, the ALJ properly evaluated the medical evidence in the record when he found the Plaintiff capable of performing a range of medium level work. [Id.]. Finally, she argues that substantial evidence supports the ALJ's conclusion that the evidence does not support the incapacitating degree of physical and mental impairments alleged by the Plaintiff. [Id. at 16-17].

## VI. ANALYSIS

The Court will address the Plaintiff's three allegations of error in turn.

### A. Medical Listing 12.05C.

The Plaintiff argues that the ALJ erred in failing to properly apply Medical Listing 12.05C. [Doc. 14 at 15]. In particular, he charges error where the ALJ found that Listing 12.05 was not met because the Plaintiff could not provide "actual IQ testing, prior to the Plaintiff turning 22, demonstrating significantly subaverage general intellectual functioning with deficits in adaptive functioning." [Id. at 15-16]. First, he argues that there is sufficient circumstantial

11

evidence of there being "onset of impairment before age 22." [Id. at 17]. Second, he argues that the ALJ gave too much deference to Dr. Axtell's inability to diagnose mental retardation under the DSM-IV standard, which is more stringent than the standard set by Listing 12.05C—what he contends to be the sole "legal definition of mild mental retardation." [Id. at 16]. Finally, he argues that ALJ erred when he found that the Plaintiff's past relevant work was "inconsistent with a diagnosis of mental retardation." [Id.]

The Commissioner maintains that the ALJ reviewed the medical evidence and determined that the Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. [Doc. 16 at 7]. The Commissioner acknowledges that "a formal diagnosis of mental retardation" is not necessary to qualify under Listing 12.05C; however, it is a relevant factor. [Id. at 8-9]. Finally, the Commissioner argues that the Plaintiff did not satisfy Listing 12.05C's diagnostic description where he failed to show significant limitations in adaptive functioning consistent with mental retardation. [Id.]

Listing 12.05C provides in relevant part:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .
> > C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Normally, a claimant can establish disability by demonstrating all of the medical findings listed for an impairment. 20 C.F.R. § 404.1525(c)(3). "If a claimant does not have

12

one of the findings, however, [he or] she can present evidence of some medical equivalent to that finding." Bailey v. Comm'r of Soc. Sec., 413 F. App'x 853, 854 (6th Cir. 2011) (citing §§ 404.1525 & 404.1526). To demonstrate a medical equivalent, the claimant must present "medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990) (emphasis in original).

Thus, to be disabled under Listing 12.05C, the Plaintiff must establish that: (1) his valid verbal, performance, or full scale IQ score was between 60 and 70; (2) he has a mental or physical impairment imposing an additional and significant work-related limitation; and (3) he had significant sub average general intellectual functioning with deficits in adaptive functioning, which manifested prior to age 22. This latter requirement—the so called "diagnostic description"—requires a claimant to demonstrate an onset of both sub average intellectual functioning and adaptive skills deficits, prior to the age of 22. Hayes v. Comm'r of Soc. Sec., 357 F. App'x 672, 675 (6th Cir. 2009); Carmack v. Barnhart, 147 F. App'x 557, 560 (6th Cir. 2005) (citing Foster v. Halter, 279 F.3d 348, 355 (6th Cir. 2001)).

In arguing that he presented evidence that satisfies Listing 12.05C, the Plaintiff directs the Court to his academic records that show (1) he was "socially promoted four times," (2) he had "single-digit percentages in most areas" on standardized tests, and (3) he had an "academic record of failing grades." [Doc. 14 at 17]. Additionally, the Plaintiff contends that his family handles "his own finances" and helps him "complete his job applications." [Id.].

In October 2010, Dr. Axtell performed a psychological evaluation and IQ testing. Dr. Axtell found that the Plaintiff's "overall intellectual abilities" were measured in the "Extremely Low range, with an FSIQ standard score of 61 at the 0.5th percentile." [Tr. 581]. Dr. Axtell opined that although his intellectual abilities were measured "in the range typically associated

13

with mental retardation," he could not diagnose him with mental retardation where "there is no evidence of mental retardation or significant intellectual deficits prior to his 18th birthday." [Tr. 586]. Dr. Axtell's findings were relied upon by the ALJ. [Doc. 16 at 7].

At step three of the sequential process, the ALJ discussed Listing 12.05 in great detail. Going through the criteria for each paragraph—A through D—the ALJ provided an explanation of why the Plaintiff failed each listing. However, for paragraph C, his explanation was somewhat terse:

> In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. While the IQ testing conducted during the consultative exam indicated that the claimant's full scale IQ was 61, there is no IQ testing that demonstrates significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before the age of 22.

[Tr. 23].

The principal role of the Court is to determine whether the conclusions of administrative law judges were "reached through application of the correct legal standards and in accordance with the procedure mandates." See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004). Here, the ALJ's reason for disqualifying the Plaintiff under Listing 12.05C was the lack of IQ testing before the age of 22 showing the requisite deficits in general intellectual functioning and adaptive deficits. However, it is well established that requiring childhood IQ testing would wrongly "foreclose recovery by all who were unfortunate enough to lack early access to appropriate testing." McPeek v. Sec'y of Health & Human Servs., 19 F.3d 19 (6th Cir. 1994). In fact, some courts have gone so far as to hold that when the only available IQ scores are from tests administered after age 22, the adult IQ tests "create a

14

rebuttable presumption of a fairly constant IQ." Bilka v. Comm'r of Soc. Sec., 252 F. Supp. 2d 472, 475 (N.D. Ohio 2002). This Court, however, is not convinced that boot-strapping or double usage of the IQ score is sufficient to satisfy the diagnostic description. See Turner v.Comm'r of Social Sec., 381 Fed. App'x 488, 492 (6th Cir. 2010).

Instead the appropriate legal standard is to determine whether the Plaintiff has "significantly subaverage intellectual functioning, current deficits in adaptive functioning, and onset before age 22."[2] McClellan v. Astrue, 804 F. Supp. 2d 678, 692 (E.D. Tenn. 2011); See Foster v. Halter, 279 F.3d at 355. Here, the Commissioner points out that the ALJ assigned great weight to Dr. Axtell's opinion that that there was no evidence of "significant intellectual deficits before his 18th birthday." [Doc 16 at 8]. However, there is in fact substantial evidence that the Plaintiff had significant intellectual deficits—he had an academic history of single-digit scores on standardized tests, social promotion, and failing grades. [Tr. 287-290]. The Plaintiff's current IQ tests "together with his school performance can easily support the conclusion that [his] deficits are longstanding." McClellan v. Astrue, 804 F. Supp. 2d at 692 (citation omitted) (explaining that developmental deficits may be inferred from "evidence of current functioning")).

The Commissioner argues that while the Plaintiff's school records may demonstrate some evidence of deficient childhood functioning, his subsequent work history and daily activities are

---

[2] "The phrasing of the diagnostic description is somewhat ambiguous. It could be read to require that both intellectual deficits and adaptive deficits have manifested before age 22, or it could be read to require only that adaptive deficits have manifested before age 22." McClellan v. Astrue, 804 F. Supp. 2d at 693. The subsequent clause, however, restates and clarifies the matter where it refers to both adaptive and intellectual deficits collectively as "the impairment." Id. (citing 20 C.F.R., Pt. 404, Subpt. P, App'x 1 § 12.05). Thus, mental retardation is viewed as a "single impairment marked by two types of deficits—intellectual and adaptive—both of which must be present prior to age 22." Id.

15

inconsistent with mental retardation. [Doc. 16 at 11]. However, the ultimate question before the Court is whether the ALJ's written decision shows that he—in accordance with the proper legal standard—"considered and rejected the evidence in favor of adaptive deficits or manifestation before age 22." <u>McClellan v. Astrue</u>, 804 F. Supp. 2d at 693. That standard would require the ALJ to analyze whether the Plaintiff's work history demonstrates his "ability to perform relatively complicated tasks prior" to his injury. <u>Foster v. Halter</u>, 279 F.3d at 355. Here, the ALJ made no such inquiry.

Accordingly, the ALJ's failure to expressly analyze the Plaintiff's impairments under the proper § 12.05(C) framework indicates that the ALJ either failed to consider evidence of mental retardation, or that he considered it but rejected it for reasons unsaid. If it was overlooked, then it denotes a lack of substantial evidence. <u>See</u> <u>Bowen v. Comm'r of Soc. Sec.</u>, 478 F.3d 742, 750 (6th Cir. 2007). If it was considered but rejected for reasons unknown, then remand is appropriate even in the face of substantial evidence supporting the ALJ's ultimate decision. <u>SEC v. Chenery</u>, 332 U.S. 194, 196, 67 S. Ct. 1575, 1577, 91 L. Ed. 1995 (1947) ("if administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable")).

"The Court reiterates that whether the record may ultimately possess substantial evidence to support a conclusion that the Plaintiff is not mentally retarded under § 12.05(C) is irrelevant because the ALJ's procedural error denied Plaintiff fair process." <u>Id</u>.; <u>see</u> <u>Abbott v. Sullivan</u>, 905 F.2d 918, 925 (6th Cir. 1990). The "ALJ's narrative decision does not provide the Court with any basis on which to engage in a meaningful review of his determination that Plaintiff's impairments did not meet or equal the § 12.05(C) definition of mental retardation."

16

<u>Id</u>. Therefore, the undersigned will recommend this case to be remanded to the Commissioner for a complete analysis under the framework provided by Listing 12.05C.

**B.      Plaintiff's ability to work under 20 C.F.R § 1527(c)(2) and (6).**

The Plaintiff argues that the ALJ erred when he considered evidence of his physical condition prior to the onset date of July 2008. [Doc. 14 at 20]. In addition, he argues that the ALJ failed to consider his 22% whole body impairment rating provided on May 31, 2007, by his treating orthopedic surgeon, Dr. Beaver. [<u>Id.</u> at 21]. He contends that pursuant to 20 C.F.R § 1527(c)(2) & (6), the ALJ is required to adequately address the records of a treating, specialist physician. [<u>Id.</u>].

The Commissioner responds by arguing that it was appropriate for the ALJ to consider evidence both before and after the onset date, where the Plaintiff's alleged disability arose from an injury that occurred years before the onset date. [Doc. 16 at 14]. Additionally, she argues that the ALJ correctly relied on the opinions of state medical consultants regarding the Plaintiff's functional capacity. [<u>Id.</u> at 15.] Finally, the Commissioner asserts that the ALJ's failure to mention Dr. Beaver's treatment notes was harmless. [<u>Id.</u> at 16.]

Under the Social Security Act and its implementing regulations, if a treating physician's opinion as to the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, it must be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). But where an opinion does not garner controlling weight, the appropriate weight to be given will be determined based upon the following factors: length of treatment, frequency of examination, nature and extent of the treatment relationship, amount of relevant evidence that supports the opinion, the opinion's consistency with the record as a whole, the

specialization of the source, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

When an ALJ does not give a treating physician's opinion controlling weight, the ALJ must always give "good reasons" for the weight given to a treating source's opinion in the decision. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). A decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *5 (1996). Nonetheless, the ultimate decision of disability rests with the ALJ. King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).

In his decision, the ALJ considered Dr. Beaver's treatment records. In particular, the ALJ relied upon Dr. Beaver's diagnosis of a "fracture to right lower extremity and right upper extremity." [Tr. 21]. Additionally, the ALJ noted that Dr. Beaver's records showed that the Plaintiff "reported significant improvements," and "used no assistive device to walk"; he was "released to work full time"; and that "he was working with no restrictions although he reported occasional pain." [Tr. 22]. The ALJ also noted that the only X-rays taken after the Plaintiff's onset date showed "no significant degenerative changes." [Id.] In short, Dr. Beaver's examination records are consistent with the residual functional capacity conclusions reached by the State Disability Determination Services medical and psychological consultants—namely, that he is "not disabled." [Tr. 25].

Accordingly, the Court finds the Plaintiff's argument to the contrary unavailing. Moreover, the ALJ is not required to comment on every piece of evidence in the record. See

18

Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989). Here, Dr. Beaver gave the Plaintiff a 22% whole body impairment on the same day the Plaintiff reported "no complaints" with being able to perform "full work with no restrictions." [Tr. 524]. Four months prior, Dr. Beaver released him to work "approximately six hours per day with a break every two hours." [Tr. 523]. The Plaintiff's 22% whole body impairment, therefore, is consistent with the ALJ's ultimate conclusion that the Plaintiff can perform medium level work, limited to "simple, non-detailed tasks." [Tr. 24].

Finally, the undersigned is not persuaded by the Plaintiff's argument that his medical records prior to the July 11, 2008 onset date should not be "used as evidence that he was not disabled by his onset date" [Doc. 14 at 21]. The Plaintiff makes this argument even as he argues that the ALJ must have explicitly considered Dr. Beaver's impairment rating given in May of 2007. [Doc. 17 at 3]. The Plaintiff cannot have it both ways.

Nevertheless, the ALJ may rely on any relevant evidence in the record to support his or her findings. 20 C.F.R. § 404.1527; 20 C.F.R. § 404.1520b. Here, the Plaintiff alleges that his disability arose precisely from injuries sustained on July 31, 2006 when he fell and "broke his right femur and fracture both his right elbow and the right side of his pelvis." [Doc. 14 at 2]. The ALJ considered (1) the severity of initial injury, (2) the degree of recovery prior to the onset date, and (3) evidence of impairments at the onset date—including whether there were new injuries or degenerative changes. [Tr. 24]. Thus, the extent at which the Plaintiff recovered from his 2006 injury is relevant, particularly when his 2010 X-rays showed no new injuries or

degenerative changes, and his post-recovery status was consistent with his residual functional capacity assessment.[3]

Based on the foregoing, the Court finds that there is substantial evidence to support the ALJ's finding.

## C.    Plaintiff's Credibility.

The Plaintiff argues that the ALJ erred when he found that the Plaintiff's statements about his pain and limitations were not credible. The Plaintiff suggests that the ALJ's decision was based on apparent inconsistencies between his statements after the onset date in July 2008 and during his recovery in 2006 and 2007. [Doc. 14 at 25]. The Plaintiff asserts that evidence dating from before the July 2008 onset date is irrelevant. Id.

The Commissioner responds by arguing that the ALJ considered the Plaintiffs subjective allegations but properly concluded that the medical evidence did not "support the incapacitating degree of intellectual and physical limitations." [Doc. 16 at 16-17].

"In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant." Walters, 127 F.3d at 531. In Duncan v. Sec. of Health & Human Servs., 801 F.2d 847, 853 (6th Cir. 1986), the court articulated the standard for evaluating subjective complaints:

> First, we examine whether there is objective medical evidence in an underlying medical condition. If there is, we then examine (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

---

[3] In the evaluation, Dr. Allison found that the Plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently. [Tr. 504]. Under 20 C.F.R. § 416.967, "[M]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."

In deciding whether the objective evidence confirms the severity of the alleged pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain, the ALJ must consider the following factors: (i) daily activities; (ii) the location, frequency, and intensity of the pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, received or have received for relief of pain or other symptoms; (vi) any measures that are used or were used to relieve pain or other symptoms; (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 1529(c)(3).

The Court notes that the ALJ's findings regarding credibility "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters, 127 F.3d at 531. However, the ALJ's finding must be supported by substantial evidence. Id. Finally, "discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." Id.

Here, the ALJ analyzed the Plaintiff's credibility in accordance with the appropriate standard. First, he found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." [Tr. 24]. However, he found that objective medical evidence—namely, the Plaintiff's residual functional capacity assessment, X-ray's, psychological assessment, and other physical examinations—were inconsistent with the intensity and limiting effects of his symptoms. [Tr. 24].

21

To support his position, the ALJ relied in part on the "conclusions reached by the State Determination Services medical and psychological consultants," which were performed nearly a year after the alleged onset date, and which found the Plaintiff capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, standing or sitting for 6 hours of an 8 hour work day, and able to operate hand or foot controls without limitations. [Tr. 25, 504]. Additionally, the State consultants found that the Plaintiff was capable of a full range of motion "in all joints;" [Tr. 510]; that he could climb, balance, stoop, kneel and crawl in frequent amounts; [Tr. 505]; and that he used no assistive devices to walk, nor did he take prescription pain medication. [Tr. 500]." This objective medical evidence conflicted with the Plaintiff's alleged inability to extend his arm or walk without assistance. [Tr. 510]. It is within the discretion of administrative law judges to discount a claimant's credibility to a certain degree where there are "contradictions among the medical reports, claimant's testimony, and other evidence." Walters, 127 F.3d at 531.

Finally, the Plaintiff's argument that medical reports prior to the onset date are irrelevant is not well-taken. Nevertheless, here the ALJ's ultimate conclusion—the Plaintiff's symptoms were not credible to the extent they conflict with the residual functional capacity assessment— explicitly embraces the Plaintiff's medical condition and impairments on the onset date and thereafter. Accordingly, the ALJ relied upon substantial evidence when he found that the Plaintiff's medical condition was inconsistent with the degree of his alleged pain and limitations. [Tr. 24].

## VII.    CONCLUSION

Accordingly, the Court finds that the ALJ's conclusion that the Plaintiff did not meet the requirements of Listing 12.05C was not supported by substantial evidence because the ALJ failed to expressly analyze the Plaintiff's impairments in accordance with the correct legal

22

standard. Therefore, it is hereby **RECOMMENDED**[4] that the Plaintiff's Motion for Judgment on the Pleadings [**Doc. 13**] be **GRANTED**, and that the Commissioner's Motion for Summary Judgment [**Doc. 15**] be **DENIED**.

Respectfully submitted,


s/ H. Bruce Guyton
United States Magistrate Judge

---

[4]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Fed'n of Teachers, 829 F.2d 1370 (6th Cir. 1987).

Case 3:12-cv-00519-TAV-HBG   Document 18   Filed 08/12/13   Page 23 of 23   PageID #: 111